Good morning all. Our first case this morning for argument is Primex Plastics v. Zamec. Mr. Basile. Please the court, Robert Basile from the Basile Law Group. I represent Primex Plastics Corporation, the appellant, and I start my presentation with concessions. Primex concedes the credibility of all four of the defendants' fact witnesses. Mr. Zamec, Mr. Kalaji, Mr. Kidd, and Mr. Acker. We have no issues with their testimony as being credible. The court didn't specifically find that, but referring to their testimony, there's certainly no indication that the court had a different view. So we accept that view. We also accept the various e-mails that were submitted, that those e-mails reflect the true beliefs of the authors. And so we also, by the way, don't contest any evidentiary rulings. Whatever evidence we wanted to get in, it was either in by consent or the judge allowed it in. And the reason that these concessions are important, of course, is that once these concessions are made, there is no reason to give deference to any of the fact finding done by the trial court. The trial court observed these witnesses, and although they didn't make a specific ruling on it, they relied on their testimony, and that's fine. What determines this appeal are matters of law. They're matters of law, for example, on the first prong that I have to prove, reasonably equivalent value. There was no finding of fact below on reasonably equivalent value. Now, reasonably equivalent value of what? $8.4 million in cash went out the door at the end of December 2009. What came back to Trienda? Actually, nothing came back. I don't understand what the significance of that is. Given the district judge's finding that Trienda was not insolvent at the time and didn't expect to be insolvent at the time, you're surely not arguing that every share repurchase is automatically a fraudulent conveyance. If ExxonMobil repurchases $1,000 worth of shares tomorrow and gets no value at all, it's not a fraudulent conveyance. So I don't understand why the critical question here isn't whether Trienda was insolvent or expected to become insolvent. And the district judge found against you on the facts on those questions. That is correct. But I have to take it in sequence, Your Honor. First of all, was there reasonably equivalent value received? No, no. Look, my question is assume there was no value at all. Fine. That's in my Exxon case. Exxon buys $100 worth of shares or Apple repurchases $1 billion worth of its own shares in the market and gets nothing in exchange. But it's solvent, so that's not a fraudulent conveyance. And that's the finding of the district court, that Trienda was solvent at the time and expected to remain so. Okay. Then I have to prove the next fraud, prong of the fraud for constructive fraud. Which is that at the time of the transfer, that Trienda expected, or reasonably should have expected, that it would incur debts for which they would not be able to pay timely. We disagree with the finding of the trial court because Mr. Acker sent out a letter, which was also reflected in email, stating that we are going to impose 75-day terms on all of our creditors, our vendors, not only for invoices that had already been issued, but invoices issued in the future. So did they intend to incur debts after the redemption? Of course. They were buying product on credit. And I gather that it is conceded that the money Primex is trying to recover was money advanced, well, debts incurred after the date of that notice. Correct, Your Honor. So Primex was agreeing to a 75-day repayment period. That was never found by the trial court. The trial court articulated it. The trial court found that Primex knew what it was doing and extended credit after Trienda said that this is our new term. On page 9, the trial court articulated it this way, which I agree. Trienda implemented 75-day terms. So whether we sued or not at the time. And Primex at that point could have said that's not an acceptable term of dealing. We are not extending any further credit. But he didn't. Primex continued extending credit. That's correct. In the normal commercial world, that's agreement to the terms. I disagree that that's agreement that the invoices are being paid when they are due. There were invoices due the next week, for example, in early January of 2010. Mr. Acker comes to us at the end of December and says, we're not going to pay those in a timely manner. We're going to impose 75-day terms. This isn't an agreement. But I gather that, again, this comes back to my initial question. That Primex is not trying to recover that amount that was due on the day Trienda said we're changing our payment terms. Correct. It's trying to recover credit extended after Trienda did that. That seems to me an absolutely critical point in this case. And I trust that you agree that that's true. It is true. Okay. The invoices were beginning in March of 2010. But the fraudulent conveyance statute protects both current and future creditors. So Primex was wearing two hats. They are not suing as a current creditor at the time of the transaction, at the time of the redemption. They're suing as a future creditor, which covers the period after the redemption. And certainly it was shortly after the redemption. So I disagree with Your Honor that because we didn't sue, because we didn't stop paying, stop supplying materials on credit, that somehow these invoices were no longer due on their due dates. We had a contract. It was in writing. It said 30 days. We had already extended that out to about 60 days. They were already not being paid when due. So if your interpretation is correct, then just by not paying your bills when they are due by way of contract, and then seeing what happens, you are now paying them when due if you're not cut off or if suit isn't filed. Frankly, there's no case law that I found on that issue, and I looked. So it's really a matter of interpretation of the language of the statute. We, of course, also had an issue of proximate cause. And we only get to proximate cause if I overcome your argument that these invoices were not paid when they were due and not intended to be paid when they are due. And the proximate cause argument is linked to a legal issue, and that is the interpretation of a contract. And that contract is the loan agreement between Trienda and First Third, or Fifth Third, excuse me. And that contract couldn't have been more clear that the term loan could be used for general company purposes. $7.5 million. The trial court never made a finding of fact on that. The trial court just said that the executives of Trienda believed that that wasn't a proper use of the funds. But the issue of law is for the court, a contract interpretation. Could that $7 million have been used to pay vendors such as Primex? In addition, there was $1.4 million just of cash. It didn't come from the loan proceeds. That was meant to pay the expenses of this redemption. Certainly that cash could have been used for general company purposes. It was cash of the company. So now we come up with $8.4 million in funds that were used for other than company purposes. There was no company purpose in this redemption. The company, Trienda, got nothing, and certainly the company's creditors got nothing. So when you have a company that supposedly failed either 13 months or 17 months, depending on how you read the court's opinion, after expending $8.4 million and change on this redemption, and the cause of the company failure was an $8.5 million unpaid bill by SAS, the approximate cause seems very clear if I overcome the other deficiencies. Obviously, if the company had $8.4 million plus the interest they paid in the interim, the $8.5 million loss would not have affected the company at all, let alone be an intervening cause between the failure of Primex to get paid when those bills were due and the redemption. The trial judge used as an intervening cause the failure of SAS to pay Trienda, but that occurred long after the invoices and questions were in default, even at the 75 days. The 75 days is still running. We haven't been paid yet. So the intervening cause identified by the court was not intervening at all. These invoices were already in default by the time SAS failed to pay the $8.5 million. The reason that Trienda did not pay Primex on the invoices in question in a timely manner had nothing to do with whatever happened in December of 2010 or June of 2011. It had to do with what was going on when those bills were due, roughly June through July or August of 2010. So the judge identified the wrong intervening cause, but again, that intervening cause would have never happened if they had applied the term loan as permitted under the term loan provisions. And again, there's an integration clause in the term loan that says your understandings, your agreements, your royal discussions don't matter unless you put it in writing that you're changing this, then the words of the contract control. And by the way, it was out the door the first day anyhow, so there was no chance for anybody to make a alteration in writing to the contract. Now, the final issue I want to address is the issue raised in the appellee's brief, which if you count the pages, over half of that brief is dedicated to the proposition that this court should favorably consider the opinions of Mr. Barrow, the expert. And as I put in the brief, Mr. Barrow's credibility was under intense fire at trial, and there was an 80-plus page post-trial briefing of which much of it was dedicated to Mr. Barrow's testimony and why it was not credited. And we've set out in our brief many of the reasons, some of them rather interesting and almost amusing, why Mr. Barrow was not credible. He didn't know the difference between an LLC and its members. He considered them, in all of his opinions, as one unit. So, of course, any money that went out from the company to one of the equity owners wouldn't hurt the company, as that term was understood by Mr. Barrow, because they were all in it together. So that was one critical flaw. Another one was there was an issue about minority discounts. When they were trying to come up with some reason why there was equivalent value, Mr. Barrow opined that a willing buyer would not expect a minority discount. When buying a minority share, because these particular shares were coming out of a majority holding, well, why would a buyer care where they were coming from? The buyer was buying a minority, 13 units out of 100. He surely is going to expect a minority discount. It doesn't matter to the minority purchaser whether they came from the majority or they came from one of the minority. I mean, this was just beyond what one would expect of an expert in an economic case. So we set out more fully our objections to Barrow, but the crucial issue is was there a credibility finding on Mr. Barrow? Not only wasn't there a credibility finding on Mr. Barrow, he went without mention in the judge's opinion. So I don't believe that this court should now credit Mr. Barrow with having valid opinions, truthful testimony. There's just no guidance for this court because there was no consideration of his testimony or his opinions below to the extent that the court looked at this intervening act and that the company would have failed as the court found in 2011, whatever the date was. That came from the capital valuation solvency report that I allowed in by consent. It was a report that was produced in a prior litigation, but as a bench trial and the fact that my adversary and I decided not to fight about evidence issues, everything came in, including Mr. Barrow's entire report. The trial court had before it not just Mr. Barrow's testimony, but his lengthy report with 70 or 80 exhibits. Surely if the trial court found him credible and relied upon him, we would have heard about it. So I would ask this court in its consideration to continue the policy, if you will, of the trial court and not credit Mr. Barrow's testimony or opinions because that wasn't done well. All right. Thank you. Thank you, Mr. Basile. Mr. Nichols. May it please the court. I'm Steve Nichols, Counsel for the Defendants and Appellees in this matter, Curtis Zamek and various Zamek family trusts. Also with me today is my co-counsel in this matter, Eric Hatchell. I want to start where Attorney Basile left off in this issue of whether the court relied upon Mr. Barrow, relied upon credibility determinations, expert testimony, and fact findings in its making of decision. Mr. Basile started out his presentation by saying this case has nothing to do with factual findings or expert witness testimony. It's all about legal issues. But then he transitions into attacking the credibility of Mr. Barrow. That's obviously not a consistent position. He's here to attack credibility. We're looking at a clear error standard, and he'd be saying to you not whether you should weigh in on credibility but whether you should grant the appropriate deference to the circuit court's finding on credibility and the circuit court's factual findings. The circuit court? The district court. The district court. I'm sorry. I'm sorry. But in addition, I think they're taking what I find to be a stretch of a position. They're saying that the district court did not make any findings as to the credibility of this expert testimony. And make no mistake, expert testimony was a huge part of this case. It took up the majority of the witness testimony time. And it seems to be that they're saying, well, the judge did not make any credibility findings or find Mr. Barrow credible because she did not specifically say so in her decision. But to be very clear, if you read her decision, her reasoning tracks almost exactly what Mr. Barrow said. For example, on page 18 of the decision, or on 18, excuse me, excuse me, it's page 17. It's 18 of their appendix, page 17 of the decision. That's where she's talking about the issue of causation. And I won't quote it exactly, but she in this essence says it is her finding that the redemption did not cause the nonpayment a year later, but instead the catastrophic failure of the SAS relationship is what caused it. And when she explains it, the reasoning she provides is exactly what Mr. Barrow testified to at trial. He went through a lengthy analysis where he did what he called the actual versus but-for world. Let's look at what actually happened. Trying to did the redemption. A year later they were unable to pay Primex. What happened in the middle? Well, $9 million was paid to Primex in the middle. But in addition, critically, the SAS relationship failed. Then he said, let's then compare that to what Primex says should have happened. No redemption, no new loan, Trianda keeps going business as usual. You still have the SAS failure. And his conclusion was that Trianda would have run out of money within a few, at almost the exact same time. And in either scenario, Primex doesn't get paid. Judge Crabb articulates that exact reasoning in her decision. And the only person who provided that testimony was Mr. Barrow. So I think there can be no question that she found his testimony to be credible. And she made factual findings consistent with the facts on which he relied. And in addition, she took it a step further. She distinguished that with the testimony of Primex's expert, Mr. Zak. She said, I find him to be not very persuasive. She said, I find that he overlooked key facts. She said, I find that he had flaws in his analysis. So she is directly criticizing, saying, I am not finding to be credible the expert testimony provided by Primex's expert. And then her reasoning tracks almost exactly the testimony and presentation of our expert. So I think there can be no question that she made credibility determinations. And she made fact findings consistent with the facts in which Mr. Barrow relied. And those, of course, cannot be overturned unless there is clear error. As we pointed out in the brief, there was abundant testimony to support her positions on her causation analysis and everything else. One final point on the scope of expert analysis. It was primarily focused on causation, at least from our standpoint. As you saw from both the decision and from our brief, plaintiff's expert didn't address the issue of causation. He made no attempt to tie the redemption that occurred in December 2009 with the nonpayment that occurred a year later. He made no attempt to address whether the intervening SAS failure played any part in the nonpayment. And he certainly didn't say anything about the fact that Trienda paid Primex over $9 million, almost everything that was owed at the time of the redemption, but except for $10,000. He didn't address any of that. Mr. Barrow did, and that was the causation analysis, and that took up the bulk of the trial. But there was one other pretty key issue, and that was reasonably equivalent value. Both experts provided extensive testimony on reasonably equivalent value. Mr. Zak, he didn't do any of his own analysis. Instead, he relied on two prior internal appraisals that Trienda had acquired, and he attacked those. He tried to poke holes in that, and that's where the judge said, I found that not to be credible. He's making mistakes in his analysis. He's ignoring key facts. Mr. Barrow, by contrast, performed his own analysis. Did they pay a fair price for these shares? Were the shares they got back, did it enhance the value of the company to the remaining shareholders? That was his opinion. The judge adopted it. So when Attorney Basil says that the court made no finding on reasonably equivalent value, that's just not true. She rejected the analysis of their expert. She adopted the analysis of our expert. So once again, you have a situation where she's hearing competing expert testimony based upon disputed factual issues. She's finding in our favor. That's a clear error standard. I'm going to now turn to the issue that came up right at the beginning of Mr. Basil's presentation, and there was a back and forth on this issue of were the invoices paid when due? And he talked about that they were extended to 75 days, and the court rightly pointed out that the money they're seeking to recover relates to invoices that were generated after the 75-day terms were imposed. But there's one key point that went unaddressed there. Mr. Basil admitted that there's no case law on this. There's no case law that says what constitutes not paid when due? Is it one day late? Is it 10 days, et cetera? And I agree with him. I haven't seen any case law on this. But there was testimony at trial on this issue. Mr. Biro is a former CFO of a company, and he testified that it is very common for companies, particularly small to mid-sized companies like Trienda, to adjust their payment terms because they will have cash flow issues throughout a given year. He said it's very common to extend it from 30 to 50, whatever it might be. And as Mr. Basil admitted, this had happened before. The credit agreement said 30 days, but the average, and this was in evidence at trial, the average over the last, I think, year to 15 months was something like 62 days. And if you compare the time period right after the redemption, I think the average time then was around 70, to the same time period a year before, there was something like a four- to five-day difference in the amount of time they were getting paid. Mr. Biro said this is very common, very common in these kind of relationships and in businesses this size. So Mr. Basil's right, there's no case law on this, but there was testimony at trial on this, and that's evidence on which the judge has a right to rely in concluding, I didn't find that these were being paid when they were past due. And remember, statute doesn't talk just about is it technically past due or not. The statute says was Trienda incurring debts that it believed or should have believed it would not be able to pay when they came due. So you have a very subjective analysis there. You have to look at what did Trienda believe at the time or what should they have believed. And this goes into another very key piece of evidence. Trienda had put together a projection of how they were going to be paying their bills after the redemption. That was put into evidence. Mr. Biro discussed it extensively. And it projected they would be able to continue paying their bills in a relatively timely manner. And, in fact, that is what happened after the redemption, including $9 million paid to Primex. So given those facts and given that testimony, it was not clear error for the court to conclude that at the time they did the redemption, Trienda believed or reasonably should have believed that they were going to continue to make payments when they came due. Finally, unless the court has any particular questions, I want to address this issue of contract interpretation. This is another attempt by Primex to say this isn't a case about factual findings or expert credibility. It's about pure legal issues. And they're saying that causation comes down to an analysis of the contract and does the term general company purposes mean Trienda could have used this to pay short-term debt vendors, including vendors like Primex. Well, first off, that's a very narrow view of the causation analysis. The causation analysis, and I won't repeat it all here, it was set forth in our brief, was much broader. It involved a detailed look at all the factors in play, what had happened during that year, that actual world versus should have been world comparison. And, in addition, it required a fairly extensive analysis of, well, Mr. Basil likes to say, hey, there was an $8.5 million shortfall from SAS. There's $8.4 million from the redemption. Jeez, those kind of match up. You could have just used the money. But it's not nearly that simple because it involves certain assumptions. I mean, if they don't do the redemption, you have to assume they're still going to get this money. They're going to get the new loan that provides the financing. Two, that the loan allowed this term loan money to be used to pay vendors, and that's the narrow issue they want you to focus on. But, three, you have to assume that this money would have been available one year later when it was necessary to pay because it wasn't until one year later that Trianda ran out of money and couldn't pay their vendors, including Primex. It wasn't just Primex. So it's a much broader analysis, and I can address all of that. I'm not going to repeat it because we addressed it pretty clearly in our brief. But back to this narrow issue of what does the term general company purposes mean? The court rightly pointed out in its decision, Primex put in no evidence at trial on that issue. And I'm looking at page 17 of the decision. The judge says plaintiff produced no evidence to confirm its contention that greater company purposes would include paying suppliers. All they are offering now is lawyer argument. But at trial, we did put in evidence. Both Mr. Zamek and Mr. Kidd, whose credibility has been conceded, testified that it was their understanding that the additional $7 million for the term loan could only be used for the redemption. It could not be used for general company purposes. Remember, this was essentially a two-part loan. It's $28 million total, $21 million for operating expenses on a revolving line, $7 million earmarked for the term loan. They both testified that they understood they could only use the $7 million for the term loan, not to pay vendors such as Primex. The banker, Burt Kidd, the lead banker with Fifth Third, this is the company who's giving us the money. He confirmed that. He said the term loan could only be used to pay the redemption. It couldn't be used to pay general company operations like paying vendors. So the judge had evidence before it that did interpret that language, that did say, no, this is what we all understood it to mean. So, again, there was evidence on which the judge reasonably relied, and it was not clear error for her to conclude, I'm going to reject Primex's preferred interpretation and I'm going to instead go with what the witness has testified to. But even if we for a moment assume, let's take their interpretation. Let's say that the loan agreement would have allowed this $7 million to be used to pay general company, pay vendors such as Primex. Let's go with that. There still are two barriers that prevent Primex from getting home on this. The first is that the contract said the money being loaned was tied to receivables, and Judge Crabb addressed this issue in her decision. Why that's critically important is that by the time the money was needed, by the time Trianda would have needed these extra funds to pay people like Primex, the receivables had dropped dramatically. The SAS had failed, they weren't ordering new product, and what receivables were out there were too old, they were too aged to count anymore. So by that point, Trianda could have had a credit line of $21 million, $28 million, or $128 million, but the bank wasn't going to give them the money because the bank at that point knew, you're no longer a good credit risk. You don't have the receivables to back this up. So they can't get over that point. The way they try to do it, and they don't come right out and say it, is they seem to suggest that what Mr. Zamek and Trianda management should have done is instead they should have still done the note, gotten the new money, taken the terminal money, and then just held on to it, just put it in a rainy day fund, on the thinking that perhaps a year from now, who knows what might happen, we might need it. Well, they tried that argument at trial, and Judge Crabb essentially said, you can't seriously be suggesting that managers of a company have that, that a fiduciary duty goes that far, that you have an obligation to just periodically grab additional money and set it aside in a rainy day fund. As she rightly said, the only way you can win on that argument is if you can show that at the time they're getting that money or have the opportunity to, they have a reason to believe they're going to need it. In other words, in this case, the way that plays out is the only way that Primax can win on the argument that they should have just taken the money and set it aside is if they can also show that at the time of the redemption, at the time they were getting the money, Trianda management knew or should have known that the SAS business was never going to come back, that they were in fact going to have this catastrophic loss of their best customer, and that they were in fact going to need this money down the line. But there was abundant testimony on that issue, facts from both sides, and the court made very clear factual findings that Kurt Zamek and the other management at Trianda, that that's not what they believed and that's not what they should have believed, that they did appropriate due diligence. They spoke to the folks in the supply chain, whether it was SAS or the upstream supplier, IGPS, that folks at Fifth Third, both Burt Kidd and their internal legal and due diligence team, also explored this and they all concluded, we think that the slowdown is going to be temporary. We believe the business is going to come back. There's all sorts of reasons to believe this is a healthy supply chain. And with that factual finding in place, there's no way Primax can argue that Trianda would have had an obligation to then just be hoarding money and saving it for a rainy day. That just doesn't exist. So even if your honors are going to interpret the contract the way that Primax says you should, and I don't think you should because it wasn't supported by the evidence, they still cannot get home on causation because they can't establish that they had an obligation to keep that money. So unless your honors have any further questions, or any questions at all, I have nothing to add. All right. Thank you, Mr. Nichols. Mr. Basile. Your honors, when I conceded credibility to all those witnesses, I wasn't just saying that the evidence they gave that hurt me came in. All of it comes in as credible. Mr. Zamek testified that the company was not paying their bills when they became due as of January 2010. So this notion that there was no evidence in the record about when the weather Trianda was actually paying them would come due is wrong. Mr. Zamek himself testified, and it's in my brief, that they were not paying their debts when they became due. I think that's actually dispositive. That's an admission by the defendant. As far as this last argument that the loan was tied to receivables, that's absolutely incorrect. By looking at the loan document, the term loan, the $7 million, $7.5 million term loan, was not tied to receivables. Only the revolving loan. We don't care. The revolving loan is not part of this appeal. It is the term loan that funded the redemption. There was no reason to take the money out the next day and put it into a rainy day fund because the term loan was available as long as the loan agreement was in effect. It had no relationship to receivables. The judge made a finding there was no evidence in the record that the term loan could be used for general company purposes, and that meant that they could pay the vendors. Again, we accepted the credibility of all the witnesses, and Mr. Kalaji testified, their CFO equivalent, testified that general company purposes meant paying the vendors the money that was owed to them. I mean, it's almost common sense. If buying supplies isn't part of general company purposes, I don't know what is. I've been pointed out that I am rigged, and I thank your honors for your consideration. All right. Thank you, Mr. Basil. Thanks to all counsel. The case is taken under advisement. Court will proceed to the second case as amended.